34 P.3d 1119

STATE of Idaho, Plaintiff–Respondent,

v.

James MARTINEZ, Defendant–Appellant.

No. 25990.

Court of Appeals of Idaho.

Oct. 23, 2001.

Newman Zollinger, Rupert, for appellant. Clayne S. Zollinger, Jr. argued.

Hon. Alan G. Lance, Attorney General; Karen A. Hudelson, Deputy Attorney General, Boise, for respondent. Karen A. Hudelson argued.

SCHWARTZMAN, Chief Judge.

James Martinez appeals the district court's denial of his motion to suppress evidence seized from his automobile. Based on the seized evidence, Martinez pled guilty to one count of trafficking in amphetamine, and the district court imposed a sentence of twenty years, with five years fixed. We affirm.

## I.

## FACTS AND PROCEDURE

On the morning of October 25, 1998, Corporal Sweesy of the Idaho State Police stopped to assist the driver of a blue Chevrolet Corsica with Kansas license plates parked in the emergency lane of Interstate 84. Sweesy made contact with the driver, Martinez, who stated that the vehicle was "broke down." There were three passengers in the car, two adults and one juvenile.

Sweesy offered to use the bumper guard on his police vehicle to push Martinez's car to a nearby Chevron station. Martinez agreed. As Sweesy pushed Martinez's car, he requested a license plate check on Martinez's Kansas plates. Dispatch told Sweesy that "Kansas is not returning" and could not confirm the validity of the license plates.

Sweesy successfully pushed Martinez's car to the Chevron station, where they were joined by Corporal Dye of the Idaho State Police. Sweesy approached the vehicle, explained to Martinez that he was unable to check the validity of Martinez's plates and asked for registration paperwork. Martinez provided the registration to Sweesy, who called the vehicle identification number (VIN) listed on the papers into Dispatch. Sweesy then returned the registration to Martinez.

Several minutes later, Dispatch reported that the VIN on the registration did not conform to standards. Sweesy again requested the registration papers from Martinez and compared the VIN on the dashboard of Martinez's car with the number listed on the registration papers. He discovered that due to a clerical error, the VIN on the registration varied by one number. Sweesy radioed in the VIN on the dashboard. While waiting for a response from Dispatch, Martinez and the other passengers went to the restroom in the Chevron station, after which one of the passengers began walking his dog in the vicinity of the car. As they waited, Sweesy and Dye talked with Martinez and the adult passengers about the purpose of their trip and received conflicting stories.

At this point, approximately twenty minutes after arriving at the Chevron station, Sweesy, a certified drug canine handler, decided to walk his drug dog, Jade, around Martinez's vehicle. Sweesy retrieved Jade from the back of his patrol car and conducted the walk around. Jade alerted twice. When Sweesy told Martinez that Jade had alerted, Martinez admitted that there was some marijuana in the car. Sweesy and Dye then conducted a search of the entire vehicle and found syringes, approximately twenty individually packaged bags of a powdery substance, and a container wrapped in duct tape containing approximately a pound of a powdery substance. The powder field-tested positive for amphetamine. After Martinez was arrested and read his rights, he stated that the drugs were his. A total of 382 grams of amphetamine was seized.

Martinez was charged with one count of trafficking in amphetamine, I.C. § 37–2732(a)(3)(B), one count of failure to affix a tax stamp, I.C. §§ 63–4205, –4207, and one count of manufacture, delivery or possession with the intent to manufacture a controlled substance where children are present, I.C. § 37–2737A. Following his arraignment, Martinez filed a motion to suppress all the seized evidence, claiming that he had been unreasonably detained in violation of the Fourth Amendment. Concluding that the officer's actions did not violate Martinez's constitutional rights, the district court denied the motion.

Martinez subsequently pled guilty to the count of trafficking in amphetamine and, in exchange, the other counts were dismissed.

The court imposed a sentence of twenty years, with five years fixed. Martinez appeals the district court's denial of his motion to suppress.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact which are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Zavala*, 134 Idaho 532, 535, 5 P.3d 993, 996 (Ct.App.2000) (citing *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App. 1996)).

## III.

## DISCUSSION

### A. The Police's Initial Contact With Martinez Was Proper Under The Community Caretaking Function

The propriety of the initial contact between Martinez and Sweesy is not contested. Sweesy stopped to do a motorist assist, within the scope of his community caretaking function. The community caretaking function involves the duty of police officers to help citizens an officer reasonably believes may be in need of assistance. *In re Clayton*, 113 Idaho 817, 818, 748 P.2d 401, 402 (1988).

### B. The Detention of Martinez To Check His Registration Was Reasonable

Martinez argues that he was improperly detained when Sweesy asked for his registration papers. He argues that the request exceeded the motorist assistance purpose of the initial encounter, and therefore amounted to an investigative detention, requiring reasonable and articulable suspicion. We disagree.

It is uncontroverted that Sweesy briefly detained Martinez when he took Martinez's registration papers. A limited seizure occurs when an officer takes a driver's license. *State v. Godwin*, 121 Idaho 491, 493, 826 P.2d 452, 454 (1992). Similarly, a limited seizure occurs upon the taking of registration papers. Idaho Code § 49–427 requires that registration papers be in the possession of the driver or carried in a vehicle anytime a vehicle is operated on the highway. By taking registration papers, the police prevent a driver from legally departing in his or her car. Here, even though Martinez's car was mechanically inoperable, the officer's taking of Martinez's registration papers deprived him of property with obvious value and amounted to a limited seizure. *See and compare State v. Nickel*, 134 Idaho 610, 7 P.3d 219 (2000).

To initiate a limited investigative stop, a police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant a brief detention. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, Sweesy's request for Martinez's registration was not to investigate a crime, but to conclude his community caretaking function. This Court has stated that once a legitimate traffic stop has occurred, "nothing in the Fourth Amendment ... preclude[s] the officer from routinely asking the motorist to exhibit his driver's license, the vehicle registration and an insurance certificate." *State v. Reed*, 107 Idaho 162, 165, 686 P.2d 842, 845 (Ct.App.1984).

Furthermore, the Idaho Supreme Court has held that it is reasonable for police officers to request identification from a driver, even if the driver is not suspected of criminal activity, because the police have a strong interest in identifying the individuals they come into contact with in any capacity. *Godwin*, 121 Idaho at 495, 826 P.2d at 456. In *Godwin*, the defendant stopped on the side of the road to wait for a friend who had been pulled over by the Idaho State Police. A second police officer approached Godwin and asked to see his license. A license check revealed that Godwin's license was suspended. Godwin argued that it was unreasonable for the officer to request his license, but the Court found that "a police officer's brief detention of a driver to run a status check on the driver's license, after making a valid, lawful contact with the driver, is reasonable for purposes of the Fourth Amendment." *Id.* The Court explained:

There are several reasons for permitting a police officer to ask for a driver's license under these circumstances. In making any stop, whether the stop is to enforce the traffic laws or to carry out the officer's community caretaker function, an officer should be allowed to identify, with certainty, the person with whom he is dealing. This is necessary to protect himself and other officers from danger, to accurately prepare any required reports concerning his contact with the motorist, and to allow the officer to adequately respond to allegations of illegal conduct or improper behavior. . . .

There is also a valid public interest in permitting a police officer to run a record check on a driver's license under these circumstances. The need to identify the person with whom a police officer is dealing would logically extend to making a correct identification and determining the validity and status of the driver's license upon which the identification is based.

*Id.*

The *Godwin* decision cited *State v. Ellenbecker,* 159 Wis.2d 91, 464 N.W.2d 427 (App. Ct.1990), in support of its position. In *Ellenbecker,* the court faced the issue of "whether an officer who learns that a motorist needs no assistance may still demand to see a driver's license and conduct a status check at the scene." *Id.* at 428. In applying the balancing test required to evaluate a Fourth Amendment claim,[1] the *Ellenbecker* court determined that legitimate governmental interests were promoted by police officers asking for driver licenses to identify all motorists they contacted for assistance purposes, namely, ensuring accuracy in written reports and protecting against later claims of improper behavior on the part of officers. 464 N.W.2d at 430. Additionally, *Ellenbecker* noted that Wisconsin statutes *implicitly recognized* this governmental interest because a relevant statute required Wisconsin drivers to surrender their licenses on demand. Furthermore, the governmental interest extended to allowing the officer to run a status check on the license because "statutory au-

thority for police to demand a driver's license would mean little if the police could not check the validity of the license." *Id.*

The *Godwin* court similarly found that the government's legitimate interest in ensuring accuracy in written reports and protecting against later claims of improper police behavior outweighed the invasion of Fourth Amendment interests. *Godwin* also determined that the government's interest was implicitly recognized by I.C. § 49–316, which requires Idaho drivers to surrender their licenses on demand to the police. 121 Idaho at 496, 826 P.2d at 457.

We see no distinction between requesting a driver's license and requesting registration papers. It is standard operating procedure for police officers to ask for both. There is a valid governmental interest in determining whether vehicles driven on Idaho's streets and highways are registered as required by law. This interest is implicitly recognized in I.C. § 49–427 which requires that drivers keep their registration documents in their cars and that registration documents are subject to inspection by any peace officer. As with a driver's license, the statutory authority to demand production of registration papers would mean little unless the police could check the validity of those documents.

Finally, even though there is a legitimate public interest in requesting registration papers and running a status check, that interest must outweigh the nature of the intrusion in order to pass the Fourth Amendment test of reasonableness. We note, however, that the intrusion here was minimal. Martinez's vehicle was inoperable so Sweesy's request did not prevent Martinez from leaving in the automobile. Furthermore, the entire period of time in which Sweesy held Martinez's paperwork was a little over six minutes. The United States Supreme Court held in *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d at 238 (1983), that a detention must be temporary and last no longer than is necessary to effectuate the

---

1.  *See Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. at 1396, 59 L.Ed.2d at 667–68 (1979): "[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion upon the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."

purposes of the stop. Six minutes was not an unreasonable amount of time for Sweesy to conduct a status check on the registration papers.

Sweesy's request for Martinez's registration and the subsequent status check constituted a very limited encroachment upon any privacy interest protected by the Fourth Amendment and was outweighed by the substantial public interest which supported Sweesy's conduct. Therefore, Martinez's brief detention met Fourth Amendment standards of reasonableness.

## C. Martinez Was Not Detained After The Return Of The Registration Papers

▮ Next, Martinez argues that he was detained for the approximately eighteen minutes that elapsed between the return of the registration papers and the time Sweesy conducted the drug dog sniff of the car. Martinez argues that he did not feel free to leave due to the presence of three police cars and several police officers. A Fourth Amendment seizure occurs when a person's liberty is restrained by physical force or show of authority such that he is not free to go about his business. *Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229; *State v. Rawlings,* 121 Idaho 930, 932, 829 P.2d 520, 522 (1992); *Matter of Mackey,* 124 Idaho 585, 861 P.2d 1250 (Ct.App.1993). The test to determine whether someone has been restrained is an objective one: looking at the totality of the circumstances, would the police conduct communicate to a reasonable person that he was not at liberty to go about his business. *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *State v. Duvalt,* 131 Idaho 550, 961 P.2d 641 (1998).

▮ Once the registration papers were returned, the police exhibited no express show of force or authority that objectively communicated to Martinez that he was still being detained. Martinez was able to leave and go to the restroom inside the gas station. Martinez's passenger took his dog for a walk. At no time did Sweesy or the other officers tell Martinez or his passengers that they had to remain by the car.

▮ While waiting, the officers did talk with Martinez and his passengers to ask them questions about the purposes of their trip. A seizure does not occur simply because a police officer approaches an individual on the street or other public place and asks him if he is willing to answer some questions, or by putting questions to someone who is willing to listen. *Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389; *Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. Where an officer merely approaches a person who is standing on the street, or seated in a nonmoving vehicle located in a public place, and poses a few questions, no seizure has occurred. *State v. Osborne,* 121 Idaho 520, 523–24, 826 P.2d 481, 484–84 (Ct.App.1991). Accordingly, Martinez was not seized solely because Sweesy and Dye engaged him in conversation.

▮ Additionally, a court must "look to whether the restrictions on the subject's freedom of movement were imposed by a factor independent of police conduct." *State v. Pick,* 124 Idaho 601, 604, 861 P.2d 1266, 1269 (Ct.App.1993) (defendant had voluntarily pulled over to side of the road to talk with a friend when contacted by the police); *see also State v. Nickel,* 134 Idaho at 613, 7 P.3d at 222 (driver's car immobilized at the end of a muddy road); *State v. Jordan,* 122 Idaho 771, 774, 839 P.2d 38, 41 (Ct.App.1992) (driver was stopped at a red light when approached by officers). If the restriction comes from a source independent of police conduct, then the subject is not seized for purposes of the Fourth Amendment. *Jordan* and *Nickel, supra.*

Here, the restriction on Martinez's movement was the inoperability of the car, a factor entirely independent from police conduct. Martinez could not drive away, and may have been hesitant to walk away leaving his disabled car with all the luggage, but he was not prevented from doing so by the police. Under a totality of the circumstances test, the police conduct did not communicate to Martinez that he was not at liberty to go about his business. *Duvalt,* 131 Idaho 550, 961 P.2d 641. Accordingly, we find that Martinez was not detained after the return of the registration papers.

## D. Checking The VIN And Conducting A Drug Canine Sniff Of The Car Did Not Constitute A Search Of The Vehicle

■ This court held in *State v. Geissler*, 134 Idaho 902, 11 P.3d 1120 (Ct.App.2000), that it was not a constitutional violation for an officer to open the door of a vehicle to check a VIN on the doorjamb to see if the vehicle was stolen. This Court followed the United States Supreme Court decision in *New York v. Class*, 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), which held that a police officer's inspection of a car to obtain a VIN did not violate the Fourth Amendment. In light of the important role that a VIN plays in the pervasive governmental regulation of automobiles, a "motorist must surely expect that ... regulation will on occasion require the State to determine the VIN of his or her vehicle." *Id.* at 113, 106 S.Ct. at 965, 89 L.Ed.2d at 90. This fact, coupled with the diminished expectation of privacy inherent in automobiles generally, led the Supreme Court to hold that there is no reasonable expectation of privacy in a VIN. *Id.* at 114, 106 S.Ct. at 966, 89 L.Ed.2d at 90–91. In this case, the VIN of Martinez's car was located on the dashboard and Sweesy was able to inspect it through the windshield. This inspection was far less intrusive than the inspection conducted in *Geissler* and was clearly not a constitutional violation.

■ The law regarding the constitutionality of a drug dog sniff of the exterior of an automobile is also well established. Most recently in *State v. Parkinson*, 135 Idaho 357, 17 P.3d 301 (Ct.App.2000), this Court reaffirmed that the use of a trained drug detection dog to sniff the exterior of a motor vehicle located in a public place does not constitute a *search* within the meaning of the Fourth Amendment. It is undisputed that Martinez's car was broken down in the public parking lot of a gas station. Sweesy had Jade with him in the back of his patrol car during the entire encounter and could have

walked the dog around at any time.[2] Once Jade alerted on the car and Martinez made his admission, the officers had probable cause to search the vehicle. *State v. Gallegos*, 120 Idaho 894, 898, 821 P.2d 949, 953 (1991).

## IV.

## CONCLUSION

Accordingly, the district court's denial of Martinez's motion to suppress evidence seized from his automobile is affirmed.

Judge LANSING and Judge Pro Tem COPSEY concur.

---

**2.** This fact is important in distinguishing this case from our recent decision in *State v. Zavala*, 134 Idaho 532, 5 P.3d 993 (2000). In *Zavala*, the police officer purposefully detained the defendant for an unreasonable period to allow time for a drug canine unit to arrive. In the present case, Martinez was not detained except for six minutes during which the officer obtained and held his vehicle registration for a routine records check, and the thirty-minute delay between the time of first contact with Martinez to the time the officers walked Jade around the car was not a stalling tactic to allow time for the dog to arrive.