**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 38083**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | **2011 Opinion No. 59** |
| **Plaintiff-Appellant,** | ) | |
| | ) | **Filed: October 6, 2011** |
| **v.** | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| **TROY EDWIN LIECHTY,** | ) | |
| | ) | |
| **Defendant-Respondent.** | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County.  Hon. Deborah A. Bail, District Judge.

Order granting motion to suppress, <u>affirmed</u>.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for appellant.  Kenneth K. Jorgensen argued.

Molly J. Huskey, State Appellate Public Defender; Sarah E. Tompkins, Deputy Appellate Public Defender, Boise, for respondent.  Sarah E. Tompkins argued.

_____

MELANSON, Judge

The State of Idaho appeals from the district court's order granting Troy Edwin Liechty's motion to suppress.  For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

The following facts were revealed at the hearing on the motion to suppress.  On the morning of March 15, 2010, a patrol officer observed a vehicle parked along the side of the road in a dirt lot.  The vehicle, which belonged to Liechty, was facing a canal and the backyards of neighborhood homes.  Concerned about the location of the vehicle in relation to the homes, the officer pulled his patrol car into the dirt lot behind Liechty's vehicle without activating the overhead lights or siren.  The officer approached the parked vehicle on foot and noticed that a sleeping bag completely covered the vehicle's rear window.  The officer also observed that the passenger side window was partially covered by a shade screen.  However, upon reaching the

1

passenger window, the officer could see Liechty sitting in the driver's seat. Liechty appeared to be holding something in his hand. The officer tapped on the passenger window, and Liechty leaned across the passenger seat to remove the window shade. At that moment, concerned for his safety and wanting to make sure Liechty did not have a weapon in his hands, the officer opened Liechty's passenger door.

Upon opening the door, the officer noticed that the object in Liechty's hand was a small flashlight. Standing in the open passenger doorway, the officer asked Liechty what he was doing parked in the dirt lot and if Liechty had any identification or weapons in the vehicle. Liechty responded that there was a kitchen knife under the backseat. Once a second officer arrived, the officer ordered Liechty out of the vehicle and the second officer placed Liechty in handcuffs. The officer subsequently located the knife in Liechty's vehicle, arrested Liechty for possession of a concealed weapon, and secured Liechty in his patrol car. The second officer searched Liechty's vehicle for additional weapons and discovered methamphetamine. Liechty was charged with possession of a controlled substance, I.C. § 37-2732(c), and concealing a dangerous weapon, I.C. §§ 18-3302(7) and (9). Prior to trial, Liechty filed a motion to suppress. The district court granted the motion, holding that Liechty was seized for purposes of the Fourth Amendment when the officer opened the car door, stood in the open doorway, and questioned Liechty. The district court therefore determined that the seizure was unlawful because it was not supported by reasonable suspicion. The state appeals.

## II.

### STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

## ANALYSIS

The state argues that the district court's conclusion that a seizure occurred was clearly erroneous. In its memorandum decision and order granting Liechty's motion to suppress, the district court first found that, when the officer opened Liechty's passenger door, the officer did so without consent. The district court went on to rule that, under the circumstances of this case, Liechty was seized when the officer opened the car door and stood in the open doorway questioning Liechty because no reasonable person would feel free not to talk to a police officer in such a situation. In support of this ruling, the district court found that the officer placed himself in a position in the open passenger doorway that prevented Liechty from driving away. The district court additionally ruled that the officer did not possess a reasonable articulable suspicion that Liechty was engaged in criminal activity prior to opening the passenger door. Specifically, the district court stated that the only fact known to the officer at the time that he opened the door was the location of a legally parked car in broad daylight.

The state does not assert on appeal that reasonable suspicion existed to support a seizure of Liechty when the officer opened the passenger door and stood in the open doorway. Rather, the state challenges the district court's conclusion that a seizure occurred in the first place. Specifically, the state argues that there was no evidence presented at the motion hearing to support the district court's finding that the officer placed himself in a position in Liechty's open passenger doorway that prevented Liechty from driving away. The state also argues that there was insufficient evidence to support the district court's conclusion that a seizure occurred because Liechty did not allege that the officer's position in the open passenger doorway communicated to Liechty that he was not free to leave. The state finally asserts that the officer's presence in the doorway did not constitute a seizure because it did not communicate to Liechty that he was detained. In the alternative, if this Court determines that a seizure took place, the state contends that suppression was not warranted based on the doctrines of attenuation and inevitable discovery.

Initially, we conclude that there was substantial evidence to support the district court's finding that the officer placed himself in a position in Liechty's open passenger doorway that prevented Liechty from driving away. At the hearing on the motion to suppress, Liechty testified that, when the officer opened the passenger door, the officer stood in the open doorway and

3

began asking questions, "Face to face, pretty much." The officer testified that, when he opened the passenger door, he could see the entire front passenger compartment, including the driver and passenger side. The officer also testified that, once Liechty admitted there was a knife in the vehicle, he maintained his position of contact with Liechty and did not move around the vehicle so he could watch Liechty while he waited for a second officer to arrive. The state also presented photographs of the vehicle and its location at the time of Liechty's encounter with the officer. The photographs depict Liechty's vehicle parked in such a way that it was reasonable for the district court to infer that Liechty could not have pulled forward to terminate his conversation with the officer and could not have backed out of the dirt lot without causing possible injury to the officer standing in the open passenger doorway. The power to draw factual inferences was vested in the district court, and the record supports the district court's reasonable conclusion that the officer placed himself in a position in Liechty's open passenger doorway that prevented Liechty from driving away.

We note that a defendant's subjective belief regarding whether he or she was free to leave during an encounter with the police is not controlling when determining whether a seizure has occurred. *See State v. Nelson*, 134 Idaho 675, 679, 8 P.3d 670, 674 (Ct. App. 2000) (scope of Fourth Amendment protection does not vary with the state of mind of the individual being approached). The district court's task is to determine, based on the totality of the circumstances, whether a *reasonable person* would feel free to decline to cooperate with police. *Id*. at 678-79, 8 P.3d at 673-74. Thus, Liechty's lack of testimony that the officer's position in the open passenger doorway communicated to Liechty that he was not free to leave does not render the district court's conclusion that a seizure occurred erroneous.

We turn next to the state's argument that the officer's presence in the doorway did not constitute a seizure because it did not communicate to Liechty that he was detained. The Fourth Amendment to the United States Constitution and its counterpart, Article I, Section 17 of the Idaho Constitution, guarantee the right of every citizen to be free from unreasonable searches and seizures. However, not all encounters between the police and citizens involve the seizure of a person. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *State v. Jordan*, 122 Idaho 771, 772, 839 P.2d 38, 39 (Ct. App. 1992). Only when an officer, by means of physical force or show of authority, restrains the liberty of a citizen may a court conclude that a seizure has occurred. *State v. Fry*, 122 Idaho 100, 102, 831 P.2d 942, 944 (Ct. App. 1991). A seizure does not occur simply

because a police officer approaches an individual on the street or other public place, by asking if the individual is willing to answer some questions, or by putting forth questions if the individual is willing to listen. *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991); *Florida v. Royer*, 460 U.S. 491, 497 (1983). Unless and until there is a detention, there is no seizure within the meaning of the Fourth Amendment and no constitutional rights have been infringed. *Royer*, 460 U.S. at 498. Even when officers have no basis for suspecting a particular individual, they may generally ask the individual questions and ask to examine identification. *Fry*, 122 Idaho at 102, 831 P.2d at 944. So long as police do not convey a message that compliance with their requests is required, the encounter is deemed consensual and no reasonable suspicion is required. *Id.*

The United States Supreme Court, in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) stated:

> Examples of circumstances that might indicate seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

Other circumstances that may indicate seizure include whether the officer used overhead emergency lights and whether the officer took action to block a vehicle's exit route. *State v. Willoughby*, 147 Idaho 482, 487-88, 211 P.3d 91, 96-97 (2009); *State v. Schmidt*, 137 Idaho 301, 302-03, 47 P.3d 1271, 1272-73 (Ct. App. 2002); *Fry*, 122 Idaho at 103, 831 P.2d at 945. However, the Fourth Amendment is not implicated where factors independent of police conduct prevent an individual from departing. *State v. Nickel*, 134 Idaho 610, 613, 7 P.3d 219, 222 (2000) (no seizure when police took possession of defendant's expired temporary permit and the defendant was discouraged from driving away because of a dead-end road and muddy conditions); *State v. Martinez*, 136 Idaho 436, 441, 34 P.3d 1119, 1124 (Ct. App. 2001) (no seizure when defendant's movement was restricted by the inoperability of his car and he was hesitant to walk away leaving his disabled car with all his luggage).

Taking into account all of the surrounding circumstances, the critical inquiry when determining whether a seizure has occurred is whether a reasonable person would have felt free to disregard the police, decline the officer's request, or otherwise terminate the encounter. *State v. Zubizareta*, 122 Idaho 823, 827-28, 839 P.2d 1237, 1241-42 (Ct. App. 1992) (no seizure when officer walked up to a parked vehicle, tapped on the window, engaged defendant in conversation,

and asked the defendant to turn off the car's motor; seizure occurred once officer asked the defendant to remain seated in the vehicle); *Fry*, 122 Idaho at 103, 831 P.2d at 945 (seizure occurred when a driver attempted to pull out of a parking space and one officer tapped on the driver's window, asked what the driver was doing, and requested a driver's license while another officer stood behind the vehicle, blocking the vehicle's exit route); *State v. Osborne*, 121 Idaho 520, 524, 826 P.2d 481, 485 (Ct. App. 1991) (no seizure when officers pulled in behind defendant's vehicle and walked up to the vehicle parked on a public street; seizure occurred when officer asked to see the defendant's driver's license because he was legally obligated to comply with the officer's request and the defendant could not have believed he was at liberty to go about his business and ignore the officer).

Here, as in *Zubizareta* and *Osborne*, no seizure occurred when the officer approached Liechty's parked vehicle and tapped on his window. Further, the officer, without activating his overhead lights, approached Liechty's vehicle alone, without a weapon drawn, and did not physically touch Liechty or use threatening language upon opening the passenger door. Therefore, the inquiry before us is whether, by opening and standing in Liechty's passenger doorway to question Liechty, the officer showed authority such that a reasonable person would not have felt free to disregard the officer, decline the officer's requests, or otherwise terminate the encounter.

We first note that the instant case is unlike other cases where a driver rolls down his or her car window in response to an officer's approach. In such cases, the encounter is consensual in nature because the level of coercion between the officer and the citizen is minimal. *See Zubizareta*, 122 Idaho at 827-28, 839 P.2d at 1241-42; *Osborne*, 121 Idaho at 524, 826 P.2d at 485. At that time, the driver has the option to decline to open the window to speak to the officer. However, when an officer approaches a vehicle and initiates questioning of a driver by opening the vehicle's door without consent, instead of asking to speak to the person through the vehicle's window, the level of coercion between the officer and the citizen is enhanced.

We also note that, in determining whether a seizure occurred, the district court found, similar to *Fry*, the officer here placed himself in a position relative to the car that prevented Liechty from driving away. As explained above, this finding was supported by substantial evidence, and whether the officer took action to block a vehicle's exit route is an appropriate circumstance to take into account when determining whether a seizure occurred. Further, while

6

acts independent of police conduct that prevent a person from leaving, such as a broken-down car or muddy road conditions, do not implicate the Fourth Amendment, the officer here deliberately placed himself in a position that prevented Liechty from leaving.[1] We also recognize, as did the district court, that the officer's position inside the doorway, alone, did not constitute a seizure. However, the officer opened the passenger door without Liechty's consent and immediately questioned Liechty as to what he was doing in the dirt lot and whether he had identification or weapons in the vehicle while the officer stood in the open passenger doorway blocking the vehicle's exit route. This was a sufficient display of authority such that a reasonable person would not feel free to decline to speak to the officer and go about the person's business. Taking into account all of the surrounding circumstances, the district court's ruling that Liechty was seized at the time that the officer opened the passenger door and stood in the open doorway was not in error.

In the alternative, the state argues that the district court's decision to exclude the methamphetamine discovered in the vehicle was in error because the methamphetamine was not acquired through the exploitation of the seizure. As a result, the state contends the attenuation and inevitable discovery doctrines apply as exceptions to the exclusionary rule. Liechty responds that the state failed to raise these arguments below. In *State v. Bower*, 135 Idaho 554, 558, 21 P.3d 491, 495 (Ct. App. 2001), we held that an appellate court is not limited by the state's particular Fourth Amendment argument below:

> While prosecutors may customarily address some written or oral argument to the court presenting the State's legal theories as to why the search or seizure was lawful, the prosecutor is not obligated to do so; nor is the trial court precluded from ruling that the evidence was lawfully acquired on a theory different from that advanced by the prosecutor. We have held that a court's analysis of the constitutionality of a search is not circumscribed by the intent or belief of the officer at the scene regarding the reason or justification for the search. Similarly, the court is not limited by the prosecutor's argument or the absence thereof.

(citations omitted). *See also State v. Newman*, 149 Idaho 596, 599 n.1, 237 P.3d 1222, 1225 n.1 (Ct. App. 2010). The state asserts that it adequately raised the application of the exceptions to

---

[1] The state also contends that Liechty was unable to drive away because he had run out of gas, not because the officer impeded Liechty's exit. Again, whether another factor independent of police conduct, such as an empty gas tank, contributed to Liechty's ability to decline to cooperate with police is not dispositive for Fourth Amendment purposes.

the exclusionary rule by asserting in response to Liechty's motion to suppress that the methamphetamine evidence should not be excluded. The state argues that, therefore, it was not required to argue each particular exception below in order to assert such exceptions on appeal. Based on the rationale of *Bower*, we conclude that the state is not prohibited from raising such arguments on appeal.

The state first asserts that the causal chain between the seizure and the discovery of methamphetamine was sufficiently attenuated to dissipate the taint of the unlawful seizure. There are three factors for a court to consider when determining whether unlawful conduct has been adequately attenuated: (1) the elapsed time between the misconduct and the acquisition of the evidence; (2) the occurrence of intervening circumstances; and (3) the flagrancy and purpose of the improper law enforcement action. *State v. Page*, 140 Idaho 841, 846, 103 P.3d 454, 459 (2004). In *Page*, an officer discovered an outstanding warrant for the defendant after unlawfully detaining him. This Court determined that the discovery of the outstanding warrant was an intervening circumstance that allowed the officer to continue to detain and eventually arrest and search the defendant. *Id*. at 459-60, 103 P.3d at 846-47.

The state concedes that the time between the seizure and the discovery of methamphetamine was short. Regarding the second factor, the state asserts that the officer did not learn about the methamphetamine based on his seizure of Liechty. Rather, the state argues, Liechty's clothing and the presence of women's underwear and binoculars in the vehicle, coupled with the officer's routine questions, were intervening circumstances that resulted in the discovery of the methamphetamine. Liechty's seizure occurred from the moment that the officer opened the door, stood in the open passenger doorway, and began questioning Liechty. Liechty's arrest led to the discovery of the methamphetamine, and his arrest was the direct result of questions posed by the officer *while standing in the open passenger doorway*. Liechty's admission that there was a weapon in the vehicle was not the product of some other intervening circumstance, nor was there an arrest or search warrant that would have allowed for the search of Liechty's vehicle despite the officer's conduct. While we acknowledge that the officer did not appear to act flagrantly or with an improper purpose, we cannot conclude that the attenuation doctrine applies here.

8

The state also argues that the inevitable discovery doctrine is applicable. This Court described this doctrine in *State v. Holman*, 109 Idaho 382, 391-92, 707 P.2d 493, 502-03 (Ct. App. 1985):

> The doctrine of "inevitable discovery" relates to hypothetical independent sources. It has been narrowly enunciated and applied by the United States Supreme Court. In *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), the Court held that evidence concerning the location of a dead body would not be suppressed, even though the evidence had been obtained by improper questioning of the accused, because the police also had organized a thorough search of the area where the body lay and its eventual discovery was inevitable. In contrast, the record here discloses no such additional line of investigation by the sheriff. Rather, the state's position appears simply to be that if the sheriff had not seized the truck improperly, he would have obtained an untainted identification from the witnesses. But this shallow truism does not invoke the doctrine of "inevitable discovery." The doctrine "is not intended to swallow the exclusionary rule whole by substituting what the police should have done for what they really did." *State v. Cook*, 106 Idaho 209, 226, 677 P.2d 522, 539 (Ct. App. 1984) (opinion expressing views of Burnett, J., joined by Walters, C.J.).

Here, the state asserts that the officer would have had the same conversation with Liechty had the officer not opened the door to speak to Liechty and, therefore, nothing would have changed and the methamphetamine would have inevitably been discovered. As discussed by this Court in *Holmon*, the issue before us is whether an additional line of investigation would have revealed the methamphetamine, not whether the evidence would have been discovered had the encounter between the officer and Liechty not occurred while the officer was standing in the open passenger doorway. Indeed, we decline to predict how such a conversation would have unfolded. The record does not disclose any additional line of investigation and, as a result, the inevitable discovery doctrine does not apply. Thus, the evidence of methamphetamine was properly excluded.

## IV.

## CONCLUSION

The record supports the district court's finding that the officer placed himself in a position in Liechty's open passenger doorway that prevented Liechty from driving away. In addition, the district court's ruling that a seizure occurred when the officer opened the passenger door and stood in the open doorway was not in error. The doctrines of attenuation and inevitable

discovery are inapplicable here. Accordingly, the district court's order granting Liechty's motion to suppress is affirmed.

Judge GUTIERREZ, **CONCURS.**

Chief Judge GRATTON, **DISSENTING**

I respectfully dissent. While the district court and the majority recite the applicable seizure standard in varying ways, I wish to first review that standard, and initially state that it is not simply that "[t]he district court's task is to determine, based on the totality of the circumstances, whether a reasonable person would feel free to decline to cooperate with police." In *State v. Willoughby*, 147 Idaho 482, 211 P.3d 91 (2009), the Idaho Supreme Court stated that the test to determine whether a seizure has occurred for Fourth Amendment purposes is "whether the officers' show of authority was such that a reasonable person would not feel free to leave." *Id.* at 486, 211 P.3d at 95. The standard, therefore, has two components, not one. The first component is the nature of the officer's actions and the second component is the reasonable person's response to those actions. The analysis considers the totality of the circumstances. *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

Turning first to the officer's actions, the Court in *Willoughby* held that "[a] seizure initiated through a show of authority requires words or actions, or both, by a law enforcement officer that would convey to a reasonable person that the officer was ordering him or her to restrict his or her movement." *Willoughby*, 147 Idaho at 486, 211 P.3d at 95. Indeed, "[a] seizure under the meaning of the Fourth Amendment occurs only 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *State v. Nickel*, 134 Idaho 610, 612, 7 P.3d 219, 221 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). A seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied. *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989); *see Brendlin v. California*, 551 U.S. 249, 254 (2007); *Scott v. Harris*, 550 U.S. 372, 381 (2007). The officer must convey a message that compliance is required; otherwise the encounter is deemed consensual. *State v. Fry*, 122 Idaho 100, 102, 831 P.2d 942, 944 (Ct. App. 1991). In *State v. Nelson*, 134 Idaho 675, 8 P.3d 670 (Ct. App. 2000), we held that "unless the circumstances of the encounter are 'so intimidating as to demonstrate that a reasonable person would have believed he [or she] was not free to leave if he [or she] had not responded,' one cannot say that an officer's request results in a seizure within the meaning of the Fourth

10

Amendment." *Id.* at 678, 8 P.3d at 673 (quoting *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216 (1984)). Thus, in my view, the officer's action must be an intentional demonstration of force or authority meant to convey restriction of movement, not simply intentional in the sense of a volitional action. Moreover, the nature of the officer's action must be intimidating,[1] at least in the sense of conveying a message that compliance is required.

Turning next to the response of the reasonable person, in *Willoughby* the Court reiterated that the nature of the officer's conduct must be such "that would convey to a reasonable person that the officer was *ordering* him or her to restrict his or her movement." *Willoughby*, 147 Idaho at 486, 211 P.3d at 95 (emphasis added). In *Nelson*, we noted that the inquiry is not whether a majority of citizens would comply with an officer's request for information, quoting Chief Justice Rehnquist's statement that while "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Nelson*, 134 Idaho at 679, 8 P.3d at 674 (quoting *Delgado*, 466 U.S. at 216). The *Nelson* Court again stated that it must be determined whether the officer's action "was so intimidating as to cause a reasonable person--not a majority of lay persons--to believe that the person was not free to leave if the person chose to ignore the request." *Id*. The *Nelson* Court also noted that the reasonable person test presupposes an innocent person. *Id*. *See also Bostick*, 501 U.S. at 438.

In this case, the officer noticed a vehicle unusually parked away from the street, facing the backs of homes across a canal, on a strip of bare land near Capital High School in Boise. As the officer approached the vehicle, he noticed that the back window was covered with what appeared to be a sleeping bag. As the officer approached the passenger side of the vehicle, he noticed Liechty inside, although the passenger window was partially covered by a shade. Liechty testified that the officer tapped on the window and Liechty stated that "the window

---

[1] This intimidating nature of the officer's action is otherwise described in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980):

> Examples of circumstances that might indicate seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

works" and reached to take the blind down and open the window. Based upon these facts, the officer attempted to initiate the encounter through the window. The officer testified that, as he could first see Liechty, he saw something in his hands. The officer stated that he asked Liechty if the door worked or would open. Liechty stated that the window worked and began to remove the screen to open the window. Based upon these facts, Liechty was content to, at least, engage the officer on a consensual basis. In order to make sure that the item in Liechty's hand was not a weapon, and for officer safety concerns, the officer opened the door instead of waiting for Liechty to remove the screen and open the window. The officer did not enter the vehicle, physically restrain Liechty, draw his weapon, or in any way verbally communicate to Liechty that he was not free to leave. At that time, there were no other officers on the scene and the patrol car lights were not activated. The officer then talked to Liechty through the open door.

Now, as I read the decision of the district court and the majority opinion, neither hold that a seizure occurred *solely* because the officer opened the door instead of engaging Liechty through the window. The district court held that:

> [A] seizure of the defendant occurred when the officer opened the car door *and* stood in the area of the opened door. No reasonable person would feel free not to talk to a police officer who was standing by their open passenger door. . . . In order to terminate the conversation, the defendant would have had to drive away in reverse, a reasonable person would not try to back out of the place they were parked if someone was standing by an opened passenger door because they could hurt the person standing by the door.

(Emphasis added.) Finally, the district court stated that "[n]o reasonable person would drive off and terminate the encounter when the only way to leave would be to back out and would result in the officer being potentially injured." Similarly, the majority states that "[w]e also recognize, as did the district court, that the officer's position inside the doorway, alone, did not constitute a seizure." The majority concludes, however, that because the officer's position inside the doorway blocked "the vehicle's exit route," a seizure occurred.

The district court found that Liechty's car "was next to a dirt mound and some bushes and would have had to have been put into reverse to pull out." This finding is crucial because the district court states that the officer's standing in the doorway, then, "effectively" blocked

12

Liechty's ability to disengage from the conversation.[2] Interestingly, Liechty never made this claim either factually or as a basis for finding a seizure. Moreover, Liechty never testified at all about a physical or practical inability, because of the officer's position and the terrain, to disengage the encounter. He did, however, testify that he was out of gas, a fact I will come back to. He also testified that he was driving a two-door Suzuki Sidekick, an SUV-type vehicle, like the small version of a Jeep--maneuverable. Photographs in the record show the small vehicle. Liechty testified that there was about fifteen feet from the front of his vehicle to the canal. The photographs in the record show that there were at least several feet to the canal. The majority concludes that "it was reasonable for the district court to infer that Liechty could not have pulled forward to terminate his conversation with the officer and could not have backed out of the dirt lot without causing possible injury to the officer standing in the open passenger doorway." The difficulty I have with the conclusion is that it presumes that to disengage from an officer, an individual must completely flee the scene. There is no question from the evidence that, even if Liechty could not have turned back to the road with just a forward turn, he could have moved the vehicle forward several feet, no less than the length of the vehicle, thus disengaging from the open door conversation. If, then, the officer did something to stop him or prevent further movement, a seizure would occur.

I agree that an officer can effect a seizure by physically blocking a person's ability to leave. But, the situation in this case is decidedly different from *Fry*, 122 Idaho at 102, 831 P.2d at 944, where, while one officer approached the passenger side window of a car in a parking stall, another officer placed himself at the back of the vehicle, blocking any exit. The second officer in *Fry* intentionally acted in such a way as to, not only practically prevent Fry from leaving, but to clearly communicate to Fry that he was ordering him not to leave. While the district court here stated that the officer's action "effectively" blocked Liechty, the majority, in an effort to demonstrate that this case is "similar to *Fry*," finds that "the officer here *deliberately* placed himself in a position that prevented Liechty from leaving" (emphasis added). This is apparently an effort by the majority to not only state that the officer was volitionally standing in

---

[2]    The State contends that the evidence in the record is insufficient to even conclude that the officer was actually standing in the open doorway. However, it is reasonable to conclude from the evidence that the officer was, upon opening the door, standing in the open doorway talking to Liechty.

13

the doorway, but that his conduct was the type of intentional, intimidating, communicative act demonstrated in *Fry* and, as I have noted, required by the applicable standards in order to effectuate a seizure. With that finding or implication I cannot disagree more. There is absolutely no support in the record to conclude that the officer's standing in the doorway was "deliberate" in that context.

The majority relies upon certain language from *Nickel*, 134 Idaho at 613, 7 P.3d at 222, which states that:

> Although as a practical matter the dead-end road and muddy conditions might have discouraged Nickel from departing, this is not dispositive for Fourth Amendment purposes. The Fourth Amendment is not implicated where factors independent of police conduct prevent an individual from departing.

From this language, the majority appears to conclude that these other factors are irrelevant. I disagree. Factors other than officer conduct are not necessarily dispositive in the sense that an officer could still effect a seizure for Fourth Amendment purposes. For example, an officer could pull up behind an inoperable car on the side of the road with its hood up. Clearly, other conditions exist that prevent the individuals inside from departing. However, if the officer, upon engaging the occupants, orders that they remain in their seats, a seizure has occurred. The *Nickel* Court's statement that "[t]he Fourth Amendment is not implicated where factors independent of police conduct prevent an individual from departing" does not mean that those factors are irrelevant, but only that no seizure has occurred in that circumstance, absent police conduct communicating detention. In fact, in *State v. Martinez*, 136 Idaho 436, 441, 34 P.3d 1119, 1124 (Ct. App. 2001), the Court held that "a court *must* 'look to whether the restrictions on the subject's freedom of movement were imposed by a factor independent of police conduct.'" (quoting *State v. Pick*, 124 Idaho 601, 604, 861 P.2d 1266, 1269 (Ct. App. 1993) (emphasis added). "If the restriction comes from a source independent of police conduct, then the subject is not seized for purposes of the Fourth Amendment." *Id.* at 441, 34 P.3d at 1124. In *Martinez*, the Court stated:

> Here, the restriction on Martinez's movement was the inoperability of the car, a factor entirely independent from police conduct. Martinez could not drive away, and may have been hesitant to walk away leaving his disabled car with all the luggage, but he was not prevented from doing so by the police.

*Id.*

In this case, Liechty's car was inoperable. He testified that he was out of gas and immediately told the officer that fact. Liechty could not drive away, and most assuredly was hesitant to walk away. Liechty was dressed in a skirt, blouse, bra containing water-filled condoms, and knee-high boots. He testified to his extreme embarrassment that children gathering at Capital High School might be able to see him when the door was opened. He was not walking away. Additionally, he testified that he had a bicycle on the back of his vehicle that he had intended to ride away but for his attire. Finally, Liechty was likely extremely hesitant to walk away leaving his disabled vehicle with personally and legally incriminating items including: pornographic magazines, petroleum jelly, condoms and/or condom wrappers, dildo-type items, binoculars, women's panties, children's panties, a fake vagina, a concealed weapon (knife), and methamphetamine. These facts, when compared to the officer's ambiguous, at best, imposition of a theoretical practical impediment to leaving the scene, lead me to the inescapable conclusion that the restrictions on Liechty's freedom of movement were imposed by factors independent of the officer's conduct.[3] In the end, based upon the totality of the circumstances, an innocent and reasonable person--say a bird watcher with binoculars and bird books--would not believe that he or she was not free to break off the encounter with the officer.

Finally, the State argues that suppression, by application of the exclusionary rule, is unwarranted in this case, specifically pointing to the attenuation and inevitable discovery doctrines. The majority rejects the application of these doctrines in this case. Recently, importantly, the United States Supreme Court reviewed its jurisprudence regarding the exclusionary rule in *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2426-27 (2011):

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[3] These facts also lead me to question whether Liechty actually submitted to a show of authority. In *Willoughby*, our Supreme Court held that for a seizure to occur "the motorist must actually submit to the show of authority." *Willoughby*, 147 Idaho at 488, 211 P.3d at 97. The Court looked to a Kansas case which "addressed the difficult question presented in cases of passive acquiescence to an ambiguous show of authority," something that might be said of the case at bar. *Id*. The *Willoughby* Court held that by the motorist remaining on the scene and stepping out of his vehicle as the officer approached was a submission to the officer's authority. *Id*. at 489, 211 P.3d at 98. The *Willoughby* Court did not have before it, as here, the fact that the motorist's vehicle was inoperable and the motorist was self-described as "indecent." The fact that Liechty remained on the scene was much more because of the presence of these circumstances, than an ambiguous show of authority by the officer.

15

seizures." The Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a "prudential" doctrine, *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998), created by this Court to "compel respect for the constitutional guaranty." *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *see Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *see United States v. Janis*, 428 U.S. 433, 454 n.29, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (exclusionary rule "unsupportable as reparation or compensatory dispensation to the injured criminal" (internal quotation marks omitted)). The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. *E.g.*, *Herring* [*v. United States*, 555 U.S. 135,] 141 n.2, 129 S.Ct. 695 (2009) ; *United States v. Leon*, 468 U.S. 897, 909, 921, n.22, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Elkins*, *supra*, at 217, 80 S.Ct. 1437 ("calculated to prevent, not to repair"). Our cases have thus limited the rule's operation to situations in which this purpose is "thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Where suppression fails to yield "appreciable deterrence," exclusion is "clearly . . . unwarranted." *Janis*, *supra*, at 454, 96 S.Ct. 3021.

Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. *Hudson v. Michigan*, 547 U.S. 586, 596, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). The analysis must also account for the "substantial social costs" generated by the rule. *Leon*, *supra,* at 907, 104 S.Ct. 3405. Exclusion exacts a heavy toll on both the judicial system and society at large. *Stone*, 428 U.S. at 490-491, 96 S.Ct. 3037. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. *Ibid*. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. *See Herring*, *supra*, at 141, 129 S.Ct. 695. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." *Hudson*, *supra,* at 591, 126 S.Ct. 2159. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. *See Herring, supra*, at 141, 129 S.Ct. 695; *Leon*, *supra*, at 910, 104 S.Ct. 3405.

Admittedly, there was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine. "Expansive dicta" in several decisions, *see Hudson*, supra, at 591, 126 S.Ct. 2159, suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself. *See Olmstead v. United States*, 277 U.S. 438, 462, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (remarking on the "striking outcome of the *Weeks* case" that "the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction"); *Mapp*, *supra* at 655, 81 S.Ct. 1684 ("[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court."). As late as our 1971 decision

in *Whiteley v. Warden*, *Wyo. State Penitentiary,* 401 U.S. 560, 568–569, 91 S.Ct. 1031, 28 L.Ed.2d 306, the Court "treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule." *Arizona v. Evans*, 514 U.S. 1, 13, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). In time, however, we came to acknowledge the exclusionary rule for what it undoubtedly is—a "judicially created remedy" of this Court's own making. *Calandra*, *supra,* at 348, 94 S.Ct. 613. We abandoned the old, "reflexive" application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits. *Evans*, *supra*, at 13, 115 S.Ct. 1185; *see*, *e.g.*, *Calandra*, *supra; Janis*, *supra; Stone*, *supra; INS v. Lopez-Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). In a line of cases beginning with *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, we also recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the "flagrancy of the police misconduct" at issue. *Id.*, at 909, 911, 104 S.Ct. 3405.

The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring*, 555 U.S., at 143, 129 S.Ct. 695. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.* at 144, 129 S.Ct. 695. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, *supra*, at 909, 104 S.Ct. 3405 (internal quotation marks omitted), or when their conduct involves only simple, "isolated" negligence, *Herring*, *supra*, at 137, 129 S.Ct. 695, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." *See Leon*, *supra*, at 919, 908 n.6, 104 S.Ct. 3405 (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

In addition, the Supreme Court stated:

Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." *Herring*, 555 U.S. at 144, 129 S.Ct. 695. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See ibid.* Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. *Ibid.*

*Davis*, ___ U.S. ___, 131 S. Ct. at 2428. In this case, the officer did not violate Liechty's Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any recurring or systemic negligence. I would apply the exclusionary rule in Idaho consistent with the United States Supreme Court's pronouncement. I further agree with the State's position regarding the applicability of the exceptions.